594 So.2d 812 (1992)
John H. SMITH and Sharon A. Smith, Husband and Wife, Appellants,
v.
MARK COLEMAN CONSTRUCTION, INC., Appellee.
No. 91-00138.
District Court of Appeal of Florida, Second District.
February 12, 1992.
Rehearing Denied March 13, 1992.
John F. Hooley of Vega, Brown, Stanley, Martin & Zelman, P.A., Naples, for appellants.
Michael F. Beal, Naples, for appellee.
PARKER, Judge.
John H. and Sharon A. Smith appeal a final judgment entered in their favor, arguing the award of damages was inadequate. We agree and reverse for a new trial.
The Smiths contracted with appellee, Mark Coleman Construction, Inc., to build a house at a construction price of $266,614. The house, completed in about June 1987, contained numerous defects. On October 28, 1988, the Smiths filed a breach of contract action against Coleman Construction. After a nonjury trial, the trial judge awarded damages for approximately nine items *813 of repairs. This appeal involves only the damages awarded for a hump in the floor of two second-story bedrooms.
Neither party or any witness disputes that prominent humps exist which are obvious to the naked eye. The hump is in the center of the two bedrooms and remains a hump across the floor to the wall in these bedrooms. There is approximately a one and three-eighths inch rise between the height of the floor at the bedroom doorways and the level of the floor at the hump. Apparently the trusses were not sealed properly and the humps appeared when tiles were placed on the roof, causing the trusses to become unaligned. The Smiths discovered the humps three or four months before the completion of the house and brought this to the attention of Coleman Construction. Coleman Construction installed a series of lag bolts to prevent further deterioration of the alignment. The repair, however, did nothing to eliminate the hump, yet Coleman Construction continued construction on the house to completion.
The Smiths attempted to present evidence to support two alternative theories of recovery. The Smiths tried to present the testimony of a real estate appraiser as to the market value of the home with the hump to support their claim that they were entitled to receive an award of the diminution of the market value between a house like theirs with no hump and their house as it existed with a hump in two bedrooms. The trial court disallowed this testimony, ruling that such an award was not the proper measure of damages in this case. The Smiths presented the testimony of a general contractor to support their alternative theory of damages which was the cost of removing the hump. Coleman Construction presented the testimony of a general contractor who testified to the cost of disguising the hump effect.
Based upon the trial judge's comments about the amount he would permit the Smiths to recover as to each repair and the total amount awarded in the final judgment, it is clear that the judge awarded $3,640 for a cosmetic masking of the floor defect. We find that award, based upon all the evidence, to be inadequate.
The supreme court, in Grossman Holdings Ltd. v. Hourihan, 414 So.2d 1037 (Fla. 1982), adopted section 346(1)(a) of the Restatement (First) on Contracts (1932) as the measure of damages for a breach of a construction contract. This subsection provides, in part, as follows:
(a) For defective or unfinished construction he [the contracting party] can get judgment [from the builder] for either
(i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or
(ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if construction and completion in accordance with the contract would involve unreasonable economic waste.
Hourihan, 414 So.2d at 1039 (quoting Restatement (First) of Contracts § 346(1)(a) (1932)).
The supreme court also cited the following comment to subsection 346(1)(a):
The purpose of money damages is to put the injured party in as good a position as that in which full performance would have put him; but this does mean he is to be put in the same specific physical position. Satisfaction for his harm is made either by giving him a sum of money sufficient to produce the physical product contracted for or by giving him the exchange value that that product would have had if it had been constructed... . Sometimes defects in a complete structure cannot be physically remedied without tearing down and rebuilding, at a cost that would be imprudent and unreasonable. The law does not require damages to be measured by a method requiring such economic waste. If no such waste is involved, the cost of remedying the defect is the amount awarded as compensation for failure to render the promised performance.
Id. (quoting Restatement (First) of Contracts § 346(1)(a) comment (1932)). In *814 short, a party is entitled to recover the cost of repairing a defect so that it is in compliance with the contract or, if that would result in economic waste, the diminution of value between a house built in accordance with the contract and the one actually built. See also Temple Beth Sholom & Jewish Center, Inc. v. Thyne Constr. Corp., 399 So.2d 525 (Fla. 2d DCA 1981).
Applying the Hourihan holding to the instant case, we conclude that the trial court erred in precluding the testimony relating to diminution of value. The Smiths presented the testimony of an engineer who testified that he had no suggestion as to a practical method of eliminating the hump. Such a repair would include removing the subflooring, flooring, and ceiling and tracking the exterior end of the truss in order to lower the interior end to the girder. The engineer cautioned that shaving or cutting the truss would be detrimental to the structural integrity of the house.
The Smiths' general contractor expert estimated that the removal of the hump by jacking up the trusses and leveling the floor would cost between $10,000 and $15,000, not including the incidental repairs that such a procedure would necessitate such as repairing the cracks in the interior and exterior walls and fixing the bedroom cabinets. He further testified that he would do the repair based on the time involved and the materials needed. At the time of his testimony, he did not know the extent of labor and materials which would be required because he had not torn up the floor to ascertain exactly what was required to make the repair. The general contractor further testified that he would not undertake such a repair without consulting an engineer. It was his opinion, however, that "anything can be repaired."
The trial judge apparently relied upon the general contractor's testimony in ruling that no economic waste would occur in repairing the hump. Based on the testimony of the engineer and the general contractor, this ruling was in error. The engineer was the only witness competent to testify to the feasibility of such a repair on the structural integrity of the house, and he knew of no way of practically eliminating the hump. Even though the general contractor estimated that he might be able to remove the hump for between $10,000 and $15,000, he did not know the effect of such repair on the structural integrity of the house. Upon initial consideration, it may seem that the Smiths should have presented experts who could testify definitively regarding whether such a repair could be effected and the exact cost for doing so. The Smiths, however, were in a difficult situation because no person could testify competently on this matter unless the person tore up the floor and examined the structure. This court is hesitant to require such a drastic and expensive course of action when Coleman Construction had the opportunity to eliminate the hump months before the house was completed.
Even if this court would find that diminution of value was not a proper measure of damages in this case, there is no substantial, competent evidence to support the amount which the trial judge awarded. Coleman Construction's expert did not testify to any method to eliminate the hump. His recommended methods of repair involved masking the hump to make it less noticeable. His first suggestion was to utilize wood leveling cant strips tapered away from the hump. This method would create a noticeable "step-up" at each bedroom doorway. His alternative suggestion was to utilize multiple coats of a laminate base material and to feather the material out into the hallway to eliminate the "step-up" at the bedroom doorways. The expert testified that the maximum cost to make the repair would be $2,800 plus a thirty percent profit margin. This totals $3,640, the amount the trial court awarded.
We find that the Smiths should not have to accept a final judgment that awards only a cosmetic fix to a noticeable construction defect. The only evidence in the record as to the cost of removing the hump was a minimum of $10,000. Thus, we conclude that the trial court erred in awarding only $3,640 for the removal of the hump. Accordingly, we reverse the final judgment and remand for a new trial on the amount *815 of damages relating to the hump. At a new trial, the Smiths should be awarded either (1) the reasonable cost of removing the hump if it does not involve unreasonable economic waste or (2) if the floor cannot be repaired without creating economic waste, the difference in value of their house with the hump in the floor and the value of a house built in accordance with the contract.
Reversed and remanded for new trial.
RYDER, A.C.J., and LEHAN, J., concur.